## DANIEL H. ARNOLD *et al. versus* HENRY C. BROWN.

In the case of a general partnership for the purpose of buying in large quantities to sell by retail, one partner has authority to sell the whole stock in trade at once by a single contract.

If, in such case, the price be appropriated to the payment of the private debt of such partner, it will not invalidate the sale as against a creditor of the partnership.

The insolvency of a partnership does not *per se* dissolve the partnership.

Nor does the absconding of a partner operate *per se* as a dissolution.

An attachment of personal property on mesne process, constitutes a mere lien ; and the general owner has power to sell the property, subject to the lien ; and such a delivery as he may be able to make, whether actual or symbolical, will be effectual to consummate the contract of sale.

The relation in which the attaching officer stands to the debtor, to the attaching creditor and to other creditors, is not such as to render the officer incompetent to purchase the property attached, subject to the lien.

THIS was an action on the case against the sheriff of Berkshire, for the default of John C. Hunt, one of his deputies.

It appeared that Joseph and Aaron Hawley were partners in the business of purchasing goods in large quantities and selling them by retail. They failed in February 1829, and a number of writs were then sued out against them, and served by Hunt, returnable at June term 1829, of the Common Pleas, on which all their partnership property was attached. Among these was a writ in favor of Bradley & Church ; whose suit was commenced before the cause of action had accrued, and was discontinued at October term 1829. Such arrangements were made by the creditors and debtors in the suits, that all the attachments, except that of Bradley & Church, were removed previously to the June term. In June, before the sitting of the court, Joseph Hawley, acting for himself and Aaron, (who left the Commonwealth about the time of the failure,) sold the goods attached to Hunt, for $ 1300 ; which was proved to be a fair price.

Hunt paid for the goods in the following manner. One of the attaching creditors was Moss K. Botsford, to whom the firm of Botsford, Hawley & Co., consisting of Tarsus Botsford and Joseph and Aaron Hawley, were indebted in the sum of $ 1000. Joseph Hawley was also, in 1825, indebted to Moss K. Botsford, in the sum of $ 500. And Moss K. Botsford agreed to pay a debt of $ 200 due from the Hawleys

to one Reed, who was one of the attaching creditors, and to indemnify them against the suit of Bradley & Church. At the request of Joseph Hawley, Hunt gave to Moss K. Botsford two promissory notes of $ 575 each, towards payment of Moss K. Botsford's demands, in consideration of his agreement to pay Reed and indemnify against Bradley & Church's action, then pending ; which notes of $ 575 were so much in payment for the goods. The balance of the sum of $ 1300, being $ 150, Hunt retained, claiming it for his fees for serving writs, about twelve in number, against the Hawleys, inventorying goods, keeping them about four months, and for what he paid to others for assisting in making the inventory and taking care of the goods. It was agreed between Hunt and Joseph Hawley, that one Tucker should say what sum Hawley should allow Hunt for his fees and expenses, but Tucker declined determining the matter. Hunt afterwards offered to leave the same question to some disinterested person.

After the sale to Hunt and while Bradley & Church's action was pending, the defendant, as sheriff, returned an attachment of the same goods, on a writ in favor of the present plaintiffs against the Hawleys. At the October term 1829, of the Common Pleas, Hunt told the defendant that he would not keep the goods any longer as deputy sheriff, and that if the defendant had any claim to them, he must take care of them himself. The defendant afterwards demanded the goods, but Hunt refused to deliver them to him.

For the purpose of reserving the questions in the case for the consideration of the whole Court, the judge who sat at the trial, ruled that the sale to Hunt was valid, and that the plaintiffs could not recover ; and that Hunt was not bound to keep the goods any longer, after notice from him to the sheriff that the sheriff must take care of them.

If these opinions were not correct, a new trial was to be granted.

*C. A. Dewey* and *Porter*, for the plaintiffs, contended that the sale to Hunt was invalid, on several grounds.

The officer attaching goods cannot purchase them. There can be no delivery in such a case. His possession of the goods is not equivalent to a delivery, because he holds them

as an agent of the law. *Clark* v. *Austin*, 2 Pick. 530; *Bigelow* v. *Willson*, 1 Pick. 492.

The relation of the officer to the attaching creditor, to the debtor, to other creditors, and as an officer of the law, is inconsistent with his becoming a purchaser. Public policy forbids such a contract. *Dawes* v. *Boylston*, 9 Mass. R. 353; *Copeland* v. *Mercantile Ins. Co.* 6 Pick. 204; *Currier* v. *Green*, 2 N. Hamp. R. 225; *Schermerhorn* v. *Van Volken burgh*, 11 Johns. R. 529; *Perkins* v. *Thompson*, 3 N. Hamp. R. 144; *Boynton* v. *Hubbard*, 7 Mass. R. 112; *Wallington's Estate*, 1 Ashmead, 307; *Newman* v. *Payne*, 2 Ves. jun. 199; *Hatch* v. *Hatch*, 9 Ves. 294; *Starr* v. *Vanderheyden*, 9 Johns. R. 253; *Mitchel* v. *Reynolds*, 1 P. Wms. 181; *Mills* v. *Goodsell*, 5 Connect. R. 475; *Armstrong* v. *Garrow*, 6 Cowen, 465; *Denny* v. *Lincoln*, 5 Mass. R. 385; *Smith* v. *Saxton*, 6 Pick. 483; *Clarke* v. *Lyman*, 10 Pick. 45.

If a fair and *bonâ fide* purchase by Hunt would have been sustained, his retention of $150 for his fees and expenses is evidence of fraud and extortion sufficient to avoid the whole transaction.

The purchase is invalid, because the effect of it is to appro priate, after the failure of the Hawleys, partnership property to the payment of the private debt of one of the partners, with the knowledge of Hunt. *Pierce* v. *Jackson*, 6 Mass. R. 243, *Fisk* v. *Herrick*, 6 Mass. R. 271; *Adams* v. *Paige*, 7 Pick. 547; *Taylor* v. *Fields*, 4 Ves. 396; *Chazournes* v. *Edwards*, 3 Pick. 5.

Joseph Hawley was not authorized to sell the whole stock in trade at once. It was not within the scope of the partnership; which was to sell goods by retail. *Quiner* v. *Marblehead Social Ins. Co.* 10 Mass. R. 482.

The sale was invalid, because the partnership had been dissolved by the failure of the firm, and also by the absconding of one of the partners; which facts were known to. Hunt. *Griswold* v. *Waddington*, 15 Johns. R. 57; Chit. on Contr. (4th Amer. ed.) 208; *Whitman* v. *Leonard*, 3 Pick. 177; *Lansing* v. *Gaine*, 2 Johns. R. 300; *Sanford* v. *Mickles*, 4 Johns. R. 224; *Abel* v. *Sutton*, 3 Esp. R. 108; *Smith* v. *Stokes*, 1 East, 363; *Thomason* v. *Frere*, 10 East, 418.

*Byington* and *G. J. Tucker*, for the defendant.

MORTON J. delivered the opinion of the Court. The defence is, that the original debtors were not the owners of the chattels at the time of the attachment. This defence it is competent for the defendant to make, and if established it will defeat the action. Although he returned that he attached the goods as the property of the original defendants, yet he is not thereby estopped from showing that they had no property in them.

The goods were formerly the property of the original debtors, and unless the sale of them which was made to Hunt before the plaintiffs' attachment, was a valid one, they then remained theirs, were duly attached, and ought to have been holden and applied to the satisfaction of the plaintiffs' execution. This sale was made for a valuable consideration, and was in every respect *bonâ fide*. The charge of $150 for the service of writs, appears large, but is shown to be perfectly fair. The agreement to refer the amount to the determination of a disinterested and impartial arbitrator, furnishes a strong, if not conclusive inference, that there was no collusion or fraud in this charge.

We are then to examine this sale as a fair transaction, wholly exempt from any fraudulent taint. The objections, and there are several of them, all grow out of the relation of the parties to the transaction and to each other.

1. The sale was made by one of two partners. And the first objection is, that one, in the absence of the other, had no authority to make this sale. It is said, that although he might sell the whole partnership stock by retail, yet that it was not according to the ordinary course of business, and so not within the scope of his authority, to sell the whole at once by a single contract. We have no evidence of the terms of association between these partners; but there is no reason to suppose that either member of the firm had any different authority than what was derived from the relation subsisting between them. Doubtless the ordinary business of the company was to purchase goods by the large quantity and to sell them in small quantities. But this cannot restrain the general power to buy and sell. The validity of a purchase

or a sale cannot be made to depend upon the amount bought and sold. The authority will expand or contract, according to the emergencies which may arise in the course of their proper business. One of their principal objects was to sell, and it would be absurd to say that either partner might sell all the goods by retail as fast as possible, but if a favorable opportunity occurred, to sell a great part or the whole at once, he would have no power to do it. That an exigency had arisen in the affairs of the partnership, which rendered a sale necessary, and which made it highly expedient and beneficial to sell in this mode, is very apparent. And we have no doubt that the one partner was authorized to make this sale in the name of the firm. *Quiner* v. *Marblehead Social Ins. Co.* 10 Mass. R. 482.

2. But it is contended by the plaintiffs' counsel, that if one partner had the power to sell the goods, yet he could not do it in payment of his own private debt. It does not appear that in the contract of sale, the mode of payment was established. It was immaterial to the purchaser how or to whom he paid the price. If a portion went to pay a private debt of one of the firm, it would not invalidate the sale and defeat the transfer of the goods. Whether it would be deemed a legal payment *pro tanto*, as against the creditors of the firm, is a question with which we have nothing to do. So if the partnership stock had been taken in satisfaction of a private debt due from one of the partners to the purchaser, it might have been deemed fraudulent as to the creditors of the company But such was not this case. The purchaser had no interest in the appropriation, and gained nothing by the mode of payment which was adopted. He made a *bonâ fide* contract for the goods ; paid an adequate consideration for them ; and we can yet perceive no legal objection to the validity of the sale.

3. It is further contended for the plaintiffs, that before the sale the partnership had been dissolved ; that the owners had become mere tenants in common, and that neither had power to sell the whole. There is no pretence that the partners *intended* to dissolve the partnership. If it was done at all by them, it was the effect of their acts against their intentions. The insolvency of one or both the partners we think would not

produce this effect. The insolvency of one might furnish to the other sufficient ground for declaring a dissolution. But, in this State, the inability to pay the company or the private debts of the partners, would not *per se* operate as a dissolution.

In England, bankruptcy, and in some of our States where insolvent laws exist, legal insolvency may produce a dissolution. Wherever the one or the other operates to vest th bankrupt's or insolvent's property in assignees or other minis ters of the law, it would produce that effect. Probably a voluntary assignment by a partner, of all his property, would do the same. In such cases the partner, being divested of his property, and rendered unable to perform the duties of a partner, would of course cease to be one. And his assignees coming in as tenants in common and not partners, the partnership would be dissolved. Watson on Partn. 242, 302 ; Gow on Partn. 285 ; *Fox v. Hanbury,* Cowp. 445 ; *Crispe v. Perritt,* Willes, 467 ; *S. C.* 1 Atk. 133 ; *Hague v. Rolleston,* 4 Burr. 2174 ; *Smith v. Stokes,* 1 East, 363 ; *Smith v. Oriell,* 1 East, 368 ; *Ex parte Williams,* 11 Ves. 5 ; *Wilson v. Greenwood,* 1 Swanst. 482 ; *Harvey v. Crickett,* 5 Maule & Selw. 336 ; *Barker v. Goodair,* 11 Ves. 78 ; *Dutton v. Morrison,* 17 Ves. 193 ; 3 Kent's Comm. (3d ed.) 53 ; *Marquand v. New York Manuf. Co.* 17 Johns. R. 529.

4. Nor will the voluntary absence of one of the partners from the State, produce a dissolution. Some of the *dicta* in *Whitman v. Leonard,* 3 Pick. 179, certainly favor the plaintiff's position. But they were not necessary to the decision of the case, and if they were, must be taken in connexion with the circumstances of that case. There were facts enough to show the note to be grossly fraudulent, without relying upon the absconding of one of the partners. The chief justice says, "here was an absconding of one partner, which dissolved the partnership." The absence was longer in that case than this, and attended with many circumstances to distinguish it from this. It well might be that *there* was such an absconding as would amount to a dissolution, and yet the temporary absence in this not produce the same effect. In England the absconding would be an act of bankruptcy, and he bankruptcy, when

determined by regular adjudication, would create a dissolution. See the above citations. But the absconding is never relied upon, there, as a dissolution. And we do not think that the absence of one of the partners, under the circumstances disclosed in this report, amounted to a dissolution of the partnership.

The objections to the power of one partner to make the sale, and to the manner in which that power was executed, having been overruled, it only remains to inquire whether the purchaser was competent to buy.

5. The goods were under attachment at the time of the sale. If the cause of action had not accrued when the writ and attachment were made, it will not affect the present question. The officer has no right to inquire whether the action can be maintained or not. He has a valid writ, which will justify him in taking and holding the goods. And so far as the officer is concerned, the defendant named in it cannot object to the attachment. The sale was made subject to this attachment, and whether it was enforced or abandoned cannot affect the validity of the sale. An attachment constitutes a mere lien upon the property. And the general owner may as well sell subject to that lien as any other. The effect of the sale will be to pass the general property incumbered by the attachment. If that be extinguished by the settlement or the failure of the suit, or the neglect to levy an execution in thirty days after judgment, the sale of the property will become absolute and the purchaser will hold it free of the incumbrance. If a part of it be taken to satisfy the judgment, he will hold the remainder. But if the whole be needed on the execution, he will acquire nothing by his purchase. These principles apply to both real and personal estate. It never was doubted that real estate under attachment might be conveyed as well as if unincumbered. And we know of no rule or principle which will prevent the transfer of chattels under attachment, any more than real estate. There may be some practical difficulty in making a delivery, as the officer and not the owner is supposed to have the possession. But such a delivery as the owner might be able to make, whether actual or symbolical, would be effectual to consummate a contract of sale. In the case at bar there could be

no difficulty on this ground, for the purchaser was the officer who had the legal possession.

6. And this presents the last question which we have to consider. The plaintiffs' counsel contend that the officer having an attachment on property, stands in such a relation to the defendant and to the property, as to render him incompetent to become the purchaser of it. It is called a fiduciary relation, and is compared to that of a trustee to a *cestui que trust*. There is no doubt of the soundness and wisdom of the principles advanced, but the doubt is of their application. A guardian cannot purchase the property of his ward ; an executor or administrator cannot purchase the estate which they represent; nor can an agent or trustee, of any description, with power to sell, become the purchaser.

The same rule applies to auctioneers, and in equity is sometimes extended to attorney and client. Paley on Princ. & Agent, 32 ; *Ex parte James*, 8 Ves. 337 ; *Hatch* v. *Hatch*, 9 Ves. 292 ; *Ex parte Bennett*, 10 Ves. 381 ; *Newman* v. *Payne*, 2 Ves. jun. 199 ; *Wallington's Estate*, Ashmead, 307 ; *Dawes* v. *Boylston*, 9 Mass. R. 353 ; *Copeland* v. *Mercantile Ins. Co.* 6 Pick. 204 ; *Church* v. *Marine Ins. Co.* 1 Mason, 341 ; *Barker* v. *Marine Ins. Co.* 2 Mason, 369.

This wise and salutary rule, designed to protect the weak and incompetent from the encroachments and overreachings of the artful and the powerful, is founded upon two principles. The one is, that the trustee has no right to derive any benefit or advantage from the trust fund ; but all his skill and labor in the management of it must be directed to the advancement of the interest of his *cestui que trust*. The other is, that the character of buyer and seller are incompatible, and can never be united in the same person, in whatever different capacities he may act. The agency of adverse interests is the surest guaranty of fidelity and equality in negotiations of this kind. The assent of two minds is essential to the contract of sale, as well as to every other contract. Hence the action of one person can never change the ownership of property. There may be formal sales made by an executor, administrator, guardian, or trustee, to themselves, or to others for them, but the legal property will still remain unchanged and chargeable with

the same trusts as before. Nor can this salutary rule be evaded by circuity of conveyances. As the trustee cannot sell directly to himself, so he cannot do the same thing indirectly, by selling to another person for his benefit. As he is bound to act in every thing pertaining to the trust, for the advantage of the *cestui que trust*, so the latter always has the option to consider the sale valid or invalid as he shall deem most for his interest. When he is capable of acting, his assent will give vitality to a contract which before only had a potential existence.

But while we recognise, and with great care and pleasure cherish these principles, we cannot discover their applicability to the question before us. The property attached bears very little resemblance to a trust fund. And the sheriff cannot be considered as sustaining the relation of agent or trustee, in any sense, to the defendant in the attachment. He is the officer of the law, and as such holds the property attached. It may be considered in the custody of the law. His duties are prescribed by law, and he is bound to execute them according to its directions, without favoritism or partiality to either party. The debtor is not considered to be under the control or influence of the officer, nor in any degree incapacitated from acting for himself and assisting and maintaining his own rights. There is no such fiduciary relation between them as to form any obstacle to their contracting with each other. Their interest is adverse. And there exist the ordinary securities for fair dealing and equal terms in their negotiations.

There may be something in the situation of the debtor and the power of the officer, which should induce a close scrutiny into their dealings, to see that there is no fraud or oppression in their contracts ; but nothing which is so much to be feared as to inhibit all contracts between them. The attaching creditor has quite as much power over the debtor as the officer employed by him, and yet there is nothing in their relative situation which will prevent them from buying and selling with each other. If either the creditor or the officer, by extortion or taking advantage of the necessities of the debtor, should obtain from him an unconscionable bargain, the law would set it aside. But we can see nothing in the situation of the property

Arnold
*v.*
Brown.

Arnold
*v.*
Brown.

or the relation of the parties, which, by the rules of law, or upon principles of sound policy, should annul a fair contract of sale.

*Judgment on the verdict.*